UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| AHMAD H.,[1] <br>     Plaintiff, <br> v. <br> KILOLO KIJAKAZI, <br>     Defendant. | Case No. 22-cv-02469-RMI <br><br> **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT [DRAFT]** <br> Re: Dkt. Nos. 15, 19 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2] The Appeals Council of the Social Security Administration declined to review the ALJ's decision. As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. § 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 3, 4) and both parties have moved for summary judgment (dkts. 15, 19). For the reasons stated below, Plaintiff's motion for summary judgment is granted in part and denied in part.

## LEGAL STANDARDS

The Social Security Act limits judicial review of the Commissioner's decisions to final decisions made after a hearing. 42 U.S.C. § 405(g). The Commissioner's findings "as to any fact,

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("*AR*"), which is independently paginated, has been filed in sixteen attachments to Docket Entry #10. *See* (Dkts. 10-1 through 10-16).

if supported by substantial evidence, shall be conclusive." *Id.* A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.,* 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On February 21, 2013, Plaintiff filed his first application for Title II benefits. *AR* at 10. Plaintiff alleged an onset date of February 22, 2008, and his date last insured was September 30, 2011. *Id.* at 11. Plaintiff's application was denied by an ALJ in May of 2015. *See id.* at 143-155. Plaintiff did not appeal the 2015 decision to the Appeals Council. Pl.'s Mot. (Dkt. 15) at 2.

On July 3, 2019, six years later, Plaintiff filed his second application for Title II benefits, alleging the same onset date and date last insured as his 2013 application. *Id.* In June of 2020, Plaintiff's application was denied by an ALJ on *res judicata* grounds. *Id.* at 10. Plaintiff timely appealed and the Appeals Council remanded the case, directing the ALJ to determine first, whether Plaintiff's 2013 claim should be reopened, and second, whether *res judicata* applied given new evidence of Plaintiff's poor mental health during the relevant time period. *Id.* at 138-140.

On remand, the ALJ found that Plaintiff's 2013 claim could not be reopened. *AR* at 11. The ALJ also determined that Plaintiff's 2019 claim was not barred by *res judicata*. *Id.* As such, the ALJ considered Plaintiff's claims on the merits, addressing the time period between February 22,

2008, the alleged onset date, and September 30, 2011, Plaintiff's date last insured. *See id.* at 7-27. The ALJ denied Plaintiff's application for disability insurance benefits in December of 2021. *Id.* at 27. The Appeals Council declined to review the ALJ's decision. *Id.* at 1. Plaintiff now seeks review of the Commissioner's decision from this court. Compl. (Dkt. 1) at 1-2.

## SUMMARY OF THE CLAIMS

There are two primary issues presented in this case: first, whether the ALJ used the appropriate standard in evaluating expert medical opinions and the Department of Veterans Affairs' (VA) disability determination, and second, whether the ALJ fully and fairly developed the record.

As to the first issue, Plaintiff contends that the ALJ should have applied the pre-2017 regulations to his claim. Pl.'s Mot. (Dkt. 15) at 7-8, 11-12. In March of 2017, the Social Security Administration ("SSA") issued new regulations directing ALJs to treat all medical opinions equally, regardless of whether they come from a treating, examining, or consulting physicians. 20 C.F.R. § 404.1520c. This was a change in policy. Prior to the 2017 regulations, ALJs gave "controlling weight" to the opinions of treating physicians—over those of examining or consulting physicians—so long as they were well-supported and consistent with the record evidence. 20 C.F.R. § 404.1527.

The 2017 regulations also changed the analysis of disability determinations from other agencies. *See* 20 C.F.R. § 404.1504. Prior to 2017, ALJs gave "great weight" to other agencies' determinations of disability. *McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002) (superseded by *Kitchen v. Kijakazi*, No. 22-35581, 2023 9th Cir. WL 5965704 (holding that the 2017 regulations replace the great weight rule established in *McCartey*)). Recognizing that criteria for disability varied among agencies and did not necessarily align with the SSA's, the 2017 regulations established that ALJs need not "provide any analysis" about findings of disability from other agencies. 20 C.F.R. § 404.1504. However, an ALJ must still "consider all of the supporting evidence" undergirding the VA's disability determinations. *See id.* Thus, an ALJ should give "great weight" to a disability determination from the VA only if the claim was filed before 2017.

Plaintiff argues that a violation of his due process rights during the adjudication of his

2013 application compels the Commissioner to reopen his earlier claim. *See id.* This "reopening," Plaintiff argues, would require that the pre-2017 standard be applied, and thus, that the ALJ erred by failing to give controlling weight to the opinion of Plaintiff's treating physician and deference to the VA's determination of disability.[3] *Id.*

The Commissioner, on the other hand, maintains that the 2013 claim was not reopened; that this court does not have jurisdiction to review the Commissioner's decision to not reopen Plaintiff's 2013 claim absent a violation of Plaintiff's constitutional rights; that no violation of Plaintiff's constitutional rights occurred; and thus, that the 2019 claim was properly evaluated using the post-2017 equal weight standard for medical opinions. *See* Def.'s Mot. (Dkt. 19).

As to whether the Commissioner based his decision on substantial evidence, Plaintiff makes several arguments: first, that the ALJ misunderstood Dr. Malancharuvil's testimony as to Plaintiff's eligibility for Listing 12.04; second that the ALJ failed to fully and fairly develop the record; and third, that the ALJ did not properly consider the VA's determination that Plaintiff is 100% disabled. *See* Pl.'s Mot. (Dkt. 15). The Commissioner disagrees with Plaintiff on all three of these points and argues the contrary. *See* Def.'s Mot. (Dkt. 19).

**SUMMARY OF RELEVANT EVIDENCE**

During his time in the U.S. Army, Plaintiff fractured his ankle. Pl.'s Mot. (Dkt. 15) at 3. After being honorably discharged, due, in part, to his ankle injury, Plaintiff began working as a mail carrier for the United States Postal Service ("USPS"). *Id.* In 2007, Plaintiff was let go at the USPS. *AR* at 125. Plaintiff alleges that his work as a mail carrier exacerbated his injuries and that, around this time, he developed severe depression. *See id.*

As mentioned above, Plaintiff first applied for Title II benefits in February of 2013. *AR* at 139. In his first application, Plaintiff only presented evidence of his physical injuries—he did not

---

[3] Re-opening a prior claim, rather than adjudicating a second application submitted for the same period, changes the filing date of the claim. 20 C.F.R. § 404.988. Most often this affects the calculation of benefits, allowing a claimant to receive benefits based on an earlier claim's filing date. Here, it affects whether the pre-2017 or post-2017 SSA regulations should be applied to Plaintiff's medical evidence. Reopening a prior claim does not affect the time period that is adjudicated. For both Plaintiff's 2013 and 2019 applications, the contested period was February 22, 2008, Plaintiff's alleged onset date, to September 30, 2011, Plaintiff's date last insured. Reopening only changes Plaintiff's filing date.

4

1   allege any mental impairments. *Id.* In his 2019 application, Plaintiff alleged that he suffered from
2   severe depression and anxiety. *Id.* After his 2019 application was denied, and before he appealed
3   the ALJ decision to the Appeals Council, Plaintiff discovered that the 2015 ALJ decision had, in
4   error, a blank exhibit list attached. Pl.'s Mot. (Dkt. 15) at 3. Plaintiff raised the issue of the blank
5   exhibit list in his request for reconsideration by the Appeals Council in 2020. *Id.* The Appeals
6   Council did not directly address the blank exhibit list, but did direct the ALJ, on remand, to
7   "ensure that any relevant evidence from the 2015 decision" was associated with Plaintiff's 2019
8   claim. *AR* at 10.

9   Plaintiff presents the following doctor's appointments from the relevant period as evidence
10  of his depression: on January 30, 2008, Plaintiff was diagnosed with depression and mood
11  disorder; on March 19, 2008, Plaintiff failed to report to a mental health appointment; on May 2,
12  2008, Plaintiff had an individual therapy appointment and was diagnosed with adjustment disorder
13  with anxious features; on May 14, 2008, Plaintiff was diagnosed with adjustment disorder and, in
14  family therapy was diagnosed with adjustment disorder with mixed features; on May 28, 2008,
15  Plaintiff was diagnosed with an adjustment disorder with depressive features at another family
16  therapy appointment; and on June 11, 2008, Plaintiff failed to report to a mental health
17  appointment. *See AR* at 17–18 (summarizing Plaintiff's 2008–2011 medical records).

18  Plaintiff also relies on the opinion of his current treating physician, Dr. Uzell, and a
19  determination by the VA that he is 100% disabled. *See* Pl.'s Mot. (Dkt. 15) at 3. Dr. Uzell's
20  opinion is outlined in a series of diagnoses letters and a mental impairment questionnaire, all of
21  which were prepared from June 2018 to August 2020. *AR* at 992–1003. Dr. Uzell states that
22  Plaintiff's depression began in "early 2008." *Id.* at 999. As letters to Plaintiff from the VA
23  indicate, Plaintiff has been found 100% disabled, and receives benefits from the VA accordingly.
24  *Id.* at 323–27. Plaintiff's VA records are dated June 2019. *Id.*

25  Plaintiff contends that the VA's determination and Dr. Uzell's diagnoses relate back to the
26  2008–2011 period because they were based on medical and treatment records from that period.
27  *See* Pl.'s Mot. (Dkt. 15); *AR* at 55–58. Plaintiff also provided testimony that he received treatment
28  from several physicians whose records he was unable to recover because their practices have

5

1    closed in the intervening years. *Id.* at 46–47.

2    **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

3    A person filing a claim for social security disability benefits ("the claimant") must show
4    that he has the "inability to do any substantial gainful activity by reason of any medically
5    determinable impairment" which has lasted or is expected to last for twelve or more months. See
6    20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's
7    case record to determine disability (*see id.* at § 416.920(a)(3)) and must use a five-step sequential
8    evaluation process to determine whether the claimant is disabled. *Id.* at § 416.920; *see also id.* at §
9    404.1520. While the claimant bears the burden of proof at steps one through four (*see Ford v.*
10   *Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020)), "the ALJ has a special duty to fully and fairly develop
11   the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d
12   441, 443 (9th Cir. 1983). Here, the ALJ appropriately set forth the applicable law regarding the
13   required five-step sequential evaluation process. *AR* at 12-13.

14   At step one, the ALJ must determine if the claimant is presently engaged in "substantial
15   gainful activity" (20 C.F.R. § 404.1520(a)(4)(i)), which is defined as work done for pay or profit
16   and involving significant mental or physical activities. *See Ford*, 950 F.3d at 1148. Here, the ALJ
17   determined that Plaintiff had not performed substantial gainful activity during the relevant period.
18   *AR* at 13.

19   At step two, the ALJ decides whether the claimant's impairment (or combination of
20   impairments) is "severe" (*see* 20 C.F.R. § 404.1520(a)(4)(ii)), "meaning that it significantly limits
21   the claimant's 'physical or mental ability to do basic work activities.'" *Ford*, 950 F.3d at 1148
22   (quoting 20 C.F.R. § 404.1522(a)). If no severe impairment is found, the claimant will not be
23   found to be disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the
24   following severe impairments: reactive depression secondary to physical complaints; status post
25   fracture of the left ankle; mild degenerative changes of the lumbar and cervical spine with no
26   stenosis or neurological involvement; status post fracture of the proximal phalanx with open
27   reduction and internal fixation; degenerative joint disease of the bilateral knees with mild swelling,
28   bursitis, and cartilage fissuring; mild calcification of the right elbow triceps insertion; and obesity.

*AR* at 13–14.

At step three, the ALJ is tasked with evaluating whether the claimant has an impairment or combination of impairments that meet or equal an impairment in the "Listing of Impairments." *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1. The listings describe impairments that are considered sufficiently severe as to prevent any individual so afflicted from performing any gainful activity. *Id.* at § 404.1525(a). Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria in that listing." *Id.* at § 404.1525(c)(3). For a claimant to show that his or her impairment matches a listing, it must meet all the specified medical criteria—an impairment that manifests only some of those criteria, no matter how severely, does not "meet" that listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If an impairment either meets the listed criteria, or if one or more impairments are determined to be medically equivalent to the severity of that set of criteria, that person is conclusively presumed to be disabled without a consideration of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the criteria or the severity of any of the listings. *AR* at 14–15.

If a claimant does not meet or equal a listing, the ALJ must formulate the claimant's RFC, which is defined as the most that a person can still do despite the limitations associated with their impairment. *See* 20 C.F.R. § 404.1545(a)(1). Here, the ALJ determined that Plaintiff retained the ability to perform light work. *AR* at 15. The ALJ explained that mentally, Plaintiff is limited to simple repetitive tasks, working more with objects than with people, avoiding hazards, and refraining from work that "is done rapidly." *Id.* at 16. Physically, the ALJ found that Plaintiff is limited to light exertion including sitting, standing and walking for up to six hours a day, with the additional limitations that he was able to lift or carry a ten (10) pounds frequently and twenty (20) pounds occasionally; frequently climb ramps and stairs; frequently balance, crouch, and crawl; and stoop and kneel as much as necessary. *Id.* The ALJ found that Plaintiff could not climb ropes, ladders, or scaffolding. *Id.*

Following the formulation of the RFC, the ALJ must determine—at step four—whether the

claimant can perform her past relevant work, which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *See* 20 C.F.R. § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform her past relevant work, the claimant will not be found disabled. *Id.* at § 404.1520(f). Otherwise, at step five, the burden shifts to the agency to prove that the claimant can perform a significant number of jobs that are available in the national economy. *See Ford*, 950 F.3d at 1149. To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines (commonly referred to as "the grids") (20 C.F.R. Pt. 404 Subpt. P, App. 2); or, alternatively, the ALJ may rely on the testimony of a Vocational Expert ("VE"). *Ford*, 950 F.3d at 1149 (citation omitted). A VE may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy, or the demands of other jobs that may be available in the national economy. *See* 20 C.F.R. § 404.1560(b)(1). An ALJ may also use other resources for this purpose, such as the Dictionary of Occupational Titles ("DOT"). *Id.*

At step four, the ALJ determined that Plaintiff is unable to perform his past relevant work as a mail carrier and store laborer. *AR* at 20. At step five, based on a VE's testimony, the ALJ determined that Plaintiff can perform the requirements of a housekeeper, document preparer, and photocopy machine operator. *Id.* at 21. Accordingly, the ALJ determined that Plaintiff was not disabled at any time during the relevant period. *Id.* at 22.

**DISCUSSION**

*The Commissioner's Decision Not to Reopen*

Judicial review of the Commissioner's decisions is limited to "final decisions … made after a hearing." 42 USC § 405(g). A decision not to reopen a prior, final benefits determination is discretionary and is generally not subject to judicial review. *California v. Sanders*, 430 U.S. 99, 107-09 (1997). However, where a plaintiff alleges a "colorable constitutional claim" the Commissioner's decision not to reopen falls within this court's jurisdiction. *Id.* (reasoning that the

8

1    Commissioner's regulations cannot prevent the courts from reviewing alleged unconstitutional

2    conduct)*; see also Evans v. Chater*, 110 F.3d 1480 (9th Cir. 1997).

3          A colorable constitutional claim must "implicate a due process right to a meaningful

4    opportunity to be heard;" an attack on the merits of a decision, alone, will not suffice. *Evans*, 110

5    F.3d at 1482. Courts have reviewed decisions not to reopen because of constitutional claims in

6    primarily two situations: when a claimant did not receive sufficient notice of the proceedings or

7    notice of the consequences of the claimant's inaction, and when the claimant did not have the

8    mental capacity to understand the proceedings and was not represented by counsel. *See e.g.,*

9    *Gonzalez v. Sullivan*, 914 F.2d 1197, 1202 (9th Cir. 1990) (finding a colorable constitutional claim

10   where the Commissioner did not notify claimant that if no request for reconsideration was made,

11   the agency's decision was final); *Evans*, 110 F.3d at 1483 (finding a colorable constitutional claim

12   where the claimant alleged that he failed to timely request review because he suffered from a

13   mental impairment and was unrepresented).

14         A constitutional claim is "colorable" so long as it is not "wholly insubstantial or frivolous,"

15   but it should not be entertained if it is "immaterial" or "made solely for the purposes of obtaining

16   jurisdiction." *Id.* (citing *Boettcher v. Secretary of Health and Human Servs.*, 759 F.2d 719 (9th

17   Cir. 1984) (citations omitted)). Notably, procedural irregularities do not automatically constitute

18   due process violations. *See Panages v. Bowen*, 871 F.2d 91, 93 (observing that while the

19   Commissioner's alleged failure to respond to an inquiry from plaintiff about which evidence to

20   submit "does bear on the procedural regularity of [the Commissioner's] determination" it was

21   "unlikely to rise to the level of a constitutional deprivation").

22         According to the Commissioner's regulations, a claim is eligible for reopening when 1) the

23   claimant seeks reopening either explicitly, by an express request to reopen a prior claim, or

24   impliedly, by submitting a second application for the same time period; 2) the claimant does so

25   within the regulatory period; and 3) the Commissioner finds that there is cause to reopen the

26   claim. 20 C.F.R. § 404.988. If a request to reopen is made within one year, the claim may be

27   reopened for any reason; if a request is made within four years, the claim may only be reopened

28   upon a finding of "good cause." *Id.* at § 404.988(a)-(b). A request to reopen that is made more

than four years after filing is not eligible for reopening. *See Id.* There are a few exceptions to the four-year limit outlined in the Commissioner's regulations. *Id.* at § 404.988(c). A finding of fraud, for example, will extend the reopening period. *Id.* None of the enumerated exceptions apply to the instant case. *AR* at 11. Thus, Plaintiff must make a colorable constitutional claim to obtain this court's review of the Commissioner's decision and to reopen his 2013 application outside the four-year window.

Here, Plaintiff failed to timely appeal the 2015 decision denying disability insurance benefits to the Appeals Council. Pl.'s Mot. (dkt. 15) at 2. As such, the ALJ decision dated May 15, 2015 is the final decision of the agency for his 2013 application. *AR* at 11. Plaintiff did not expressly request that his 2013 application be reopened, but the ALJ recognized his 2019 application as an implied request to reopen the 2013 claim. *Id.* Noting that the 2019 application was filed outside the regulatory period—four years and three months after the 2015 decision was issued and over six years after Plaintiff's 2013 application was filed—the ALJ determined that reopening was not appropriate. *Id.*

Plaintiff contends that he failed to timely appeal the 2015 decision because the ALJ attached a blank exhibit list to the decision. Pl.'s Mot. (dkt. 15) at 6. This error, Plaintiff argues, left him unable to ascertain which evidence the ALJ used to reach the conclusion that Plaintiff was not disabled, and he was therefore unable to address the ALJ's reasons for denial on appeal. *Id.* As such, Plaintiff argues that the blank exhibit list "made it impossible" for Plaintiff to appeal, violating his 5th Amendment due process rights. *Id.*

Certainly, an agency action that wrongfully prevents a claimant from appealing an otherwise-appealable decision would implicate the due process clause of the 5th Amendment. However, Plaintiff's contention that the blank exhibit list precluded his appeal of the 2015 decision is unconvincing. Plaintiff seems to assert that the blank exhibit list amounted to a denial of benefits so devoid of explanation, justification, or reasoning that it left Plaintiff not only without the means to address the ALJ's concerns on appeal, but unable to appeal at all. This assertion is on shaky ground—the Commissioner does not require that claimants make reasoned arguments to request review of an ALJ's decision. Indeed, claimants need only fill out a form. *See*

10

1  *AR* at 140 (instructing Plaintiff how to appeal by submitting form HA-520 Request for Review of Hearing/Decision). Reasoned arguments, of course, will aid claimants in their bid for remand, but they are not a prerequisite to receiving review by the Appeals Council. Even if the court accepts Plaintiff's premise—recognizing that claimants are entitled to a full and thorough explanation of denial—his argument survives only if the court ignores the ten-page decision to which the blank exhibit list was attached.

The 2015 decision references many exhibits throughout its discussion of Plaintiff's claim. These exhibits are described, in text, by date, time, content, and relevance. For example, the ALJ cites to Exhibit 5F after stating "In April 2009 … Jaren Bombach, M.D. noted that x-rays showed an enthesopathy calcification at the triceps insertion of the olecranon." *AR* at 149. Similarly, citing Exhibit 7F, the ALJ wrote, "claimant injured his left index finger around April 2010 and was diagnosed with a displaced intraarticular P1 fracture …. On May 19, 2010, the claimant was doing very well and had great motion to about 70 degrees of PIP motion with full extension." *Id.* The ALJ's decision is rife with such descriptions. Even without an exhibit list, Plaintiff could deduce that Exhibit 5F referred to his April 2009 medical records from Dr. Bombach, and that Exhibit 7F referred to his April and May treatment records from his finger fracture.

It is true that by citing to various exhibits, but not including a complete exhibit list, the records to which the ALJ referred may have been more difficult to identify. But the ALJ's 2015 decision is far from ambiguous. It is certainly not so vague as to leave Plaintiff ignorant of the merits of his application or the evidence upon which the ALJ relied to make her decision. On the contrary, the evidence relied upon in the ALJ's assessment was described with sufficient detail for Plaintiff to identify which of his medical records and other proffered evidence were referenced. In short, the blank exhibit list—although a procedural irregularity—did not interfere with Plaintiff's meaningful opportunity to be heard.

Further, Plaintiff was represented by counsel at the time of the 2015 decision. *AR* at 11. To the extent that Plaintiff alleges that he did not have the mental capacity to appeal the decision, his representation prevents him from taking advantage of the *Evans* line of cases—all of which found due process violations only where the claimant was both mentally impaired and unrepresented.

11

The court finds that the blank exhibit list does not rise to the level of a colorable constitutional claim. Consequently, the court does not have jurisdiction to review the Commissioner's decision not to reopen Plaintiff's 2013 application. Therefore, the appropriate filing date upon which to base the ALJ's standards of review is July 3, 2019. This finding disposes of two of Plaintiff's arguments for remand—that the pre-2017 "controlling weight" standard applies to his treating physician's report, and that the pre-2017 deferential standard applies to the VA's 100% disability determination.

### Dr. Malancharuvil's Testimony Regarding Listing 12.04

Plaintiff argues that the ALJ misunderstood Dr. Malancharuvil's testimony and that Dr. Malancharuvil "actually found that [Plaintiff] met Listing 12.04." Pl.'s Mot. (Dkt. 15) at 9. After a review of the record, the court agrees with the Commissioner that this statement is overbroad. *See* Def.'s Mot. (Dkt. 19) at 7. At the hearing, Dr. Malancharuvil bifurcated his analysis, finding that prior to 2018, there was not enough objective evidence to support a finding that Plaintiff met Listing 12.04. *AR* at 51-54. Dr. Malancharuvil did find that Plaintiff met Listing 12.04 starting in 2018, but, as the ALJ properly noted, this is irrelevant to Plaintiff's current application because it is seven years *after* his date last insured. *AR* at 20.

### The ALJ's Duty to Develop the Record

In social security proceedings, ALJs have "a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Because SSA proceedings are inquisitorial, rather than adversarial, in nature, courts have repeatedly recognized the responsibility of ALJs to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103 (2000); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006). ALJs are not "mere umpire[s]" who passively assess the evidence presented to them. *Widmark*, 454 F.3d at 1068 (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)). Rather, an ALJ must "conscientiously probe into, inquire of, and explore all the relevant facts." *Id.* (citing *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). When an ALJ is presented with ambiguous evidence, conflicting testimony, or an insufficient record, it is incumbent upon the ALJ to take steps to resolve the ambiguity, settle the

12

conflict, or supplement the record. *See Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001) (holding that the ALJ failed to fully and fairly develop the record when he relied on the equivocal testimony of a physician who repeatedly indicated that diagnosis was difficult without more information from the claimant's physicians). This duty exists regardless of the claimant's status as represented or unrepresented. *Cox*, 587 F.2d at 991.

Accordingly, an ALJ must take reasonable steps to ensure that questions raised by medical evidence—or the lack thereof—are carefully addressed so that a determination of disability may be made, whether favorable or unfavorable to the claimant, on a sufficient evidentiary record. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); *see also Smolen*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [a doctor's] opinion[] in order to evaluate [it], he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physician[] or submitting further questions to [him or her]."). An ALJ may discharge their duty to develop the record by subpoenaing records from or submitting questionnaires to the claimant's physicians; extending or ordering a new hearing; or employing a new medical expert to examine the record. *Tonapetyan*, 242 F.3d at 1150. Without taking action to resolve ambiguities and gaps in the record, an ALJ cannot make a decision "supported by substantial evidence" as is required by the SSA.

In the instant case, Plaintiff presented two significant sources of medical evidence—statements from his treating physician, Dr. Uzell, and a 100% disability determination from the VA—that were dismissed by the ALJ because they were unsupported by objective clinical findings. Instead, the ALJ relied on the opinions of the consulting physicians who testified at Plaintiff's hearing: Dr. Malancharuvil and Dr. Brown. However, Dr. Malancharuvil and Dr. Brown's testimony was nothing if not equivocal—both physicians were reluctant to give definitive opinions about Plaintiff's disability status because of the significant gaps and ambiguities in his medical record.

Throughout his testimony, Dr. Malancharuvil stated that his findings were made "without conviction because we don't have the records to support it." *AR* at 53. Indeed, he questioned Plaintiff's attorney to ensure that the full record was before him, stating that he "just want[ed] to

13

make sure [he was] not missing anything." *Id.* at 48. When directed to the VA's final determination that Plaintiff was 100% disabled, Dr. Malancharuvil asked, "But we don't have access to [the records supporting that decision]?" *Id.* at 49. Dr. Malancharuvil again expressed discomfort when the ALJ asked him to determine Plaintiff's eligibility for the SSA's mental impairment listings: "So does he meet the listings objectively? I am not able to assert that with any conviction …. It's a difficult record." *AR* at 53.

The ALJ asked Dr. Malancharuvil whether there was "enough in the record for [him] to make a functional assessment during that period;" his response was, at best, reluctant:

> Well, we have to assume … when [] objective evidence is not present then the burden is to prove the other way. So, we have to assume that he is functional from a psychiatric point of view … He certainly has some limitations. That I can gather even from the meager record … That is because he had physical problems and … he wasn't well enough at one time, and he couldn't move around, and he was becoming very agitated, anxious and depressed. That's the impression I am getting, but we don't have the benefit of any records. *Id.*

Dr. Malancharuvil further testified that he could do very little with the VA's 100% disability determination without examining the objective treatment records on which it was based, stating that Plaintiff "did not meet [an SSA listing] not because he didn't have any symptoms. Because we don't have any records, that's why he did not meet. He may have met, I do not know that. That's a decision this court will kindly have to make." *Id.* To say that Dr. Malancharuvil made a confident and definitive diagnosis would be an overstatement.

Dr. Brown's testimony was replete with similar ambiguity. Plaintiff's medical records, according to Dr. Brown were "in and of themselves [] not adequate enough to determine any type of ongoing impairment or limitation." *AR* at 64. Dr. Brown noted that he was unable to find an ongoing or severe impairment because he didn't have "enough information to adequately assess the severity of the impairment or any residual functional limitations." *Id.* at 65. Again, when pressed by the ALJ for his determination, Dr. Brown equivocated: "I can't establish a permanent impairment because of the large gaps and paucity of the records." *Id.* at 68.

The ALJ acknowledged both Dr. Malancharuvil's and Dr. Brown's statements that the record lacked evidence and characterized that lack of evidence as proof that Plaintiff is not

14

disabled. *See e.g., AR* at 14 (noting Dr. Brown's statement about the significant gaps in the record); *AR* at 15 (summarizing Dr. Malancharuvil's testimony that Plaintiff does not meet listing 12.04 "due to a lack of supporting evidence"). That may be the case. Certainly, the absence of evidence of disability could be used to show that a claimant is not disabled. However, when, as here, an ALJ is presented with an absence of evidence, and, simultaneously, conflicting and ambiguous testimony as to the significance of that absence, the ALJ must investigate to determine whether there is something missing from the record.

Here, conflicting evidence does exist, and thus, Plaintiff's sparse medical record presents a significant ambiguity. The VA determined that Plaintiff was 100% disabled. *AR* at 323. Plaintiff asserts, and informed the ALJ during his hearing, that this determination was based on medical records that were not available for review, but that establish disability prior to his date last insured. *See Id.* at 49. Further, Plaintiff's treating physician, Dr. Uzell, who he has been seeing since 2018, opined that Plaintiff suffered from severe depression "starting in 2008." *AR* at 999. It is unclear whether Dr. Uzell based this opinion only on Plaintiff's subjective statements, or if it was based on treatment records from other physicians or the VA. Plaintiff asserts that Dr. Uzell's opinion was based on medical records that were not before the ALJ or the testifying experts. This was, Plaintiff alleges, because several doctors that treated Plaintiff during the relevant period have stopped practicing, and he was unable to collect records from them. *AR* at 47–47.

The ALJ dismissed Plaintiff's sparse record as an issue, noting that Plaintiff's attorney assured the ALJ that "the record is complete." *AR* at 18. However, this court's review of the record and hearing transcripts found no such assertion. On the contrary, Plaintiff's attorney was clearly concerned about his inability to obtain medical records relevant to Plaintiff's claim, stating that he was "trying diligently" to get the records from Plaintiff's former physicians whose practices had closed but that they "couldn't get the records." *Id.* at 46-47. Further, neither the ALJ nor Plaintiff's attorney discussed or made any inquiries as to the records used by the VA to make its disability determination—this despite Dr. Malancharuvil's statements that such records would be critical to assessing the relevance of the VA's determination. Even assuming Plaintiff's attorney did tell the ALJ that the record was complete, such a statement does not discharge the ALJ's duty to develop

15

the record in the face of significant ambiguity or a lack of sufficient evidence.

In conclusion, the ALJ was presented with conflicting and ambiguous evidence: On one hand, Dr. Uzell's opinion and the VA's 100% disability determination, which Plaintiff assured the ALJ were supported by objective medical treatment records from the relevant period; on the other hand, the equivocal and reluctant testimony of Dr. Malancharuvil and Dr. Brown, neither of whom could say with any conviction whether or not Plaintiff was disabled during the relevant period because of the lack of records. The court can find no evidence in the record that resolves this ambiguity. The record does not indicate that the ALJ took any steps (such as subpoenaing records from the VA, extending the hearing to allow Plaintiff's counsel to procure the medical records from his treating physician, etc.)[4] to fill the gaps in Plaintiff's medical history, nor to confirm whether Dr. Uzell and the VA did, in fact, rely on records that demonstrate Plaintiff's disability as of September 30, 2011, his date last insured. As such, this court is unable to discern which evidence the ALJ used to support his decision—let alone, whether it meets the "substantial evidence" standard.

By relying on the equivocal testimony of the consulting physicians, the ALJ failed to fully and fairly develop the record, and thus, did not base Plaintiff's disability determination on substantial evidence. The ALJ had a responsibility to further investigate whether the "paucity of records" was due to an absence of disability, or whether the VA and Dr. Uzell relied upon objective evidence of Plaintiff's mental and physical health that, if supplied, would form a more complete picture of Plaintiff's disability for the Commissioner to consider. Accordingly, the case must be remanded so that a proper record can be developed. On remand, the ALJ is ORDERED to 1) send questionnaires to Dr. Uzell, palintiff's treating physician, and the VA, or to subpoena the records upon which their opinions were based with respect to the Plaintiff's disability between February 22, 2008 and September 30, 2011, and 2) to convene and conduct a second hearing in the

---

[4] Again, applying the 2017 regulations, the ALJ was not required to give deference to the VA's determination of disability. 20 C.F.R. § 404.1504. The ALJ is, however, required to consider the supporting evidence underlying the VA's determination. *Id.* This is particularly important in light of Dr. Malancharuvil's testimony that the VA's records were necessary to complete a full analysis of Plaintiff's disability.

event that new evidence of Plaintiff's disability surfaces as a result of further inquiry into the above-mentioned records.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's Motion for Summary Judgment in part, and this case is REMANDED for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: 9/26/2023

ROBERT M. ILLMAN
United States Magistrate Judge